Judge ERDMANN
delivered the opinion of the court.
A general court-martial composed of members convicted Hospital Corpsman Second Class Ivor G. Luke, contrary to his pleas, of two specifications of indecent assault upon Seaman Recruit TN in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2000).[1] Luke was sentenced to confinement for two years and a bad-conduct discharge. The convening authority approved the sentence as adjudged and the United States Navy-Marine Corps Court of Criminal Appeals affirmed the find *311 ings and sentence. United States v. Luke, No. NMCCA 200000481, 2004 CCA LEXIS 218, at *16, 2004 WL 2187577, at *6 (N.M.Ct.Crim.App. Sept. 28, 2004).
Upon Luke’s appeal to this court in 2005, we initially granted two evidentiary issues and later granted a supplemental issue as to whether Luke’s conviction could be affirmed in light of newly discovered evidence.[2] Following two United States v. DuBay, 17 C.M.A. 147, 37 C.M.R. 411 (1967), hearings and two Court of Criminal Appeals decisions, the case is before this court for the third time. We now review the following three issues: whether newly discovered evidence would probably have produced a substantially more favorable result; whether the military judge erred when he held that the Government was not required to disclose Prosecution Exhibit (PE) 17 to the defense in pretrial discovery; and whether Luke’s due process rights have been violated by the lengthy post-trial processing of his appeal. We hold that the newly discovered evidence would probably not have produced a substantially more favorable result; if the military judge erred in holding that the Government was not required to provide the defense with PE 17 in pretrial discovery, it was harmless error; and Luke’s post-trial due process rights were not violated. We therefore affirm the Navy-Marine Corps Court of Criminal Appeals.

DISCUSSION

As the three issues before the court present discrete legal and factual matters, we will set forth the facts and procedural background relevant to each in the discussion of the individual issues.
I. Whether the newly discovered evidence of Mills’ misconduct renders his conviction unreliable

Factual and Procedural Background:

The situation giving rise to Luke’s conviction took place when he was serving as a hospital corpsman aboard the USS Port Royal. Luke was accused of indecent assault upon a shipmate, Seaman Recruit TN, when she sought a pelvic exam from him after Luke diagnosed her boyfriend, Fireman RA, another shipmate, with a sexually transmitted disease. Luke contested the charges and maintained that he did not examine TN nor did he commit an indecent assault upon her. At Luke’s court-martial TN and RA both testified to a series of events which supported the indecent assault specifications and which Luke denied.[3] The defense theory of the ease was that TN and RA made up the allegations against Luke in order to avoid the consequences of the command discovering their romantic relationship, which was in violation of ship policy.
In addition to testimony from TN and RA, the Government presented testimony from four Naval Criminal Investigative Service (NCIS) investigators and two experts from the United States Army Criminal Investigation Laboratory (USACIL). The USACIL witnesses testified about serological and DNA testing performed on several items removed from the sleeping quarters of the medical compartment on the USS Port Royal where TN alleged the incident took place, as well as a bra and panties worn by TN during the incident.
*312 Phillip Mills, then a forensic chemist at USACIL, conducted the serology[4] analysis of the evidence in Luke’s case. Mills examined a bedsheet, a bra, a pair of panties, and a pillowcase for serological evidence. At Luke’s court-martial, Mills testified about stains he found on the sheet and the bra which revealed the presence of amylase and epithelial cells. Mills did not find any stains of consequence on the pillowcase or the panties.
Mills testified that amylase is an enzyme that is found in most body fluids in low concentrations but is found in high concentrations in saliva. Epithelial cells are cells forming epithelium, the lining of body cavities and the covering of the skin and mucous membranes. 2 Schmidt, supra note 4, at E~ 164. Mills explained that epithelial cells are found throughout the body and contain DNA.
Mills testified that the amylase and the epithelial cells on the bedsheet were consistent with saliva and vaginal secretions. The amylase on the bra was found in a high enough concentration that it was “indicative of saliva.” Mills further testified that the epithelial cells found on the bra could have come from TN simply wearing the bra. He sent those stains to Marilyn Chase, another USACIL examiner, for DNA analysis.
Chase was qualified as an expert at Luke’s court-martial in the forensic application of serological and DNA analysis. She testified about the techniques used to conduct DNA analysis, the quality control procedures in place at USACIL, as well as the peer review process for DNA analysis at USACIL. Chase examined TN’s bra, her panties, a cutting from the sheet, and a cutting from a blanket. Chase testified that “[w]hen I analyzed the DNA in the sheet, it was consistent — or—with a mixture — what you see in a mixture of the DNA profiles that were also seen in the blood standards of Luke and [TN].” Regarding the sample found on the bra worn by TN, Chase testified that her analysis revealed DNA types from at least three people on the bra which were consistent with the DNA profiles of TN, Luke, and RA.[5] Defense counsel questioned Chase about the possibility of contamination of the samples in testing and the possibility of degradation of the specimens. Defense counsel also raised the possibility of exacerbation of degradation of a mixed sample when there are a number of different profiles in a specimen. On redirect examination, trial counsel questioned Chase about the specimens in Luke’s case and Chase stated “my controls worked properly in this case. I saw no indication of contamination in any of my reagents or any of the other controls in this case.”[6]
The testimony given by Mills and Chase as to the presence of saliva on TN’s bra was relied upon by the Government to support TN’s account of the incident (that Luke had sucked on her breast during the examination). The Government relied on the DNA on the bedsheet as proof that the encounter took place as TN described, contradicting the defense’s position that any evidence of saliva and Luke’s DNA on the sheet resulted because he had masturbated and then sucked his thumb on the bed that same day. Luke was subsequently found guilty of two specifications of indecent assault in violation of Article 134, UCMJ.
In 2005, six years after Luke’s court-martial and one month prior to argument on the two issues originally granted by this court, USACIL issued a memorandum to all staff judge advocates informing them that disci *313 plinary action had been taken against Phillip Mills, the USACIL forensic examiner who had conducted the serological examination in this ease. The USACIL memorandum noted that the disciplinary action was taken after it had been discovered that Mills had cross-contaminated and/or switched samples within and between several cases, made a false data entry and altered documentary evidence, falsely stated the results of an examination which he had not performed, and misrepresented work he had performed.
In response to a defense motion, this court granted a supplemental issue addressing the newly discovered evidence of Mills’ misconduct and its possible impact on the ease. Luke I, 63 M.J. at 61; Luke, 62 M.J. 328. We set aside the decision and ordered further inquiry under DuBay, to determine “whether a Government forensic examiner contaminated Appellant’s DNA sample or otherwise falsified pertinent test results.” Luke I, 63 M.J. at 61. A DuBay hearing was subsequently conducted on June 2 and 8, 2006.[7] United States v. Luke, 64 M.J. 193, 194 (C.A.A.F.2006) (interlocutory order, Appendix A).
Based on testimony and evidence presented at the hearing, the DuBay military judge found that “Mr. [Mills] demonstrated a pattern of mistakes in conducting DNA analysis” but “[n]o evidence was presented that Mi’. [Mills] ever altered any results to falsely show the presence or absence of DNA in a sample, or that his failure to follow proper procedures was an attempt to improperly influence or alter the outcome of DNA analysis.” Id. at 196. The DuBay military judge found “Mr. [Mills] was proficient in performing serology analysis. He had a full understanding of the standard procedures for conducting serology casework.” Id. He also found that Mills only performed the serology portion of the analysis in Luke’s ease and Chase did the DNA analysis on the samples that Mills prepared. Id. at 196-97. The DuBay military judge found that Mills did not conduct the DNA analysis and therefore never had an opportunity to falsify the results. Id. at 197. He also found that there was no possibility of cross-contamination between the bedsheet and the bra. Id.
Pursuant to the remand order, the DuBay military judge’s findings were returned directly to this court and after further briefing on the supplemental issue, we remanded the case to the Court of Criminal Appeals for further consideration. United States v. Luke, 65 M.J. 5 (C.A.A.F.2007) (summary disposition). On May 27, 2008, the Court of Criminal Appeals ordered a second DuBay hearing to determine the status of USACIL’s internal investigation and to examine the two independent DNA experts as to the possible impact of Mills’ misconduct on Luke’s case. United States v. Luke, No. NMCCA 200000481, slip op. at 4 (N.M.Ct.Crim.App.May 27, 2008). The second DuBay decision reviewed a draft of the USACIL report and noted that the final report was due on September 30, 2008. The second DuBay military judge concluded that “[n]o prior facts established by the prior Dubay [sic] hearing were modified or altered.”
Relying on the DuBay hearings as well as the USACIL final report on Mills’ misconduct released on September 30, 2008, the Court of Criminal Appeals issued an opinion affirming the original findings and sentence on July 31, 2009. United States v. Luke, No. NMCCA 200000481, 2009 CCA LEXIS 270, at *24, 2009 WL 2345124, at *8 (N.M.Ct.Crim.App. July 31, 2009). The CCA found:
The facts elicited both during the USACIL review of Mr. Mills’ work and during the DuBay hearings demonstrate that Mr. Mills’ DNA analysis while at USACIL suffered from a number of errors. Notwithstanding the seriousness of these errors, as appropriately commented on by the military judge during the second DuBay hearing, there is no evidence that Mr. Mills had any involvement in the appellant’s ease *314 beyond the serological analysis.... [T]he evidence relating to deficiencies in Mr. Mills’ DNA analysis would be of limited probative value in assessing the accuracy of his serological examination in the appellant’s ease and, albeit potential impeachment evidence, would not probably pi’o-duee a substantially more favorable result for the accused.
Id. at *14 — *15, 2009 WL 2345124, at *5 (citation, footnote, and quotation marks omitted).

Analysis:

Rule for Courts-Martial (R.C.M.) 1210(f)(2)[8] sets forth the grounds for granting a new trial based on newly discovered evidence, specifically:
(2) Newly discovered evidence. A new trial shall not be granted on the grounds of newly discovered evidence unless the petition shows that:
(A) The evidence was discovered after the trial;
(B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and
(C) The newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.
“[T]he reviewing court must make a credibility determination, insofar as it must determine whether the ‘newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.’ ” United States v. Brooks, 49 M.J. 64, 69 (C.A.A.F.1998) (citation omitted). “The reviewing court does not determine whether the proffered evidence is true; nor does it determine historical facts. It merely decides if the evidence is sufficiently believable to make a more favorable result probable.” Id.
The parties agree that subsections (A) and (B) of R.C.M. 1210(f)(2) are satisfied but disagree as to subsection (C). Luke argues that the newly discovered evidence of Mills’ “misconduct, dishonesty and sloppiness” would probably produce a more favorable result at a new trial. Luke urges this court to set aside the findings and sentence because the newly discovered evidence attacks the reliability of the Government’s scientific analysis and raises questions about the “conclusions that formed the bedrock of Appellant’s conviction.”
The Government counters that the impeachment evidence of Mills’ misconduct is not an adequate basis to convene a new court-martial because the new evidence does not refute an essential element of the Government’s ease. In light of all of the other evidence presented at Luke’s court-martial, the Government argues that it is unlikely that impeachment of Mills would result in a more favorable outcome for Luke.
At the first DuBay hearing, six current and former employees of the USACIL testi *315 fied, including Mills and Chase. The findings of fact and conclusions of law of the military judge following the DuBay hearing contained a number of specific findings as to the procedures Mills followed in conducting the serological examination and included the following:
29. Mr. [Mills] demonstrated a pattern of mistakes in conducting DNA analysis, and on at least one occasion, he attempted to cover up his mistake by making a false data entry.
30. No evidence was presented that Mr. [Mills] ever altered any results to falsely show the presence or absence of DNA in a sample. Or that this failure to follow proper procedures was an attempt to [improperly influence or alter the outcome of the DNA analysis in any of the cases.
31. It is evident, however, that Mr. [Mills] had significant problems with the DNA analysis process, which calls into question the forensic reliability of the results of his DNA casework.
32. Mr. [Mills] disciplinary and proficiency problems were all related to his performance of DNA analysis. Mr. [Mills] had never demonstrated a lack of proficiency in any of his other duties.
33. Mr. [Mills] was proficient in performing the serological analysis....
34. In Appellant’s case, Mr. [Mills] performed the serology portion, but did not conduct any of the DNA analysis.
35. Mr. [Mills] understood the standard procedure for conducting serology analysis, and followed it in Appellant’s case.
43.The presence of Appellant’s DNA on the bra can be explained in one of three ways: a) Appellant came into contact with the bra sometime prior to it being collected as evidence; b) the bra became contaminated after it was collected as evidence by coming into contact with Appellant’s DNA from another sample; or c) the results were falsified.
44. With respect to Mr. [Mills], he did not conduct the DNA analysis, so he did not have the opportunity to falsify the results. Also, he had no motive to falsify the results, such as the desire to cover up a mistake, as in the documented case. Also, no evidence was presented that Ms. [Chase] or anyone else ever sought to falsify the results.
45. The panties could not have contaminated the bra with Appellant’s DNA, because the Appellant’s DNA was not present on, the panties.
46. Neither the bed sheet or any other item could have contaminated the bra during the serology portion, because the sample of the bra was cut and sealed in a test tube before the other items were opened.
47. The bra was not contaminated with Appellant’s DNA during the serology portion of the forensic analysis, and the results of the DNA analysis were not falsified.
Luke, 64 M.J. at 196-97. Based on the evidence presented at the DuBay hearing, none of these findings could be found to have been clearly erroneous. However, viewed in light of the details which emerged in USACIL’s report on Mills’ misconduct which was issued two years after the first DuBay hearing, Findings 32 and 33 of the first DuBay military judge, regarding Mills’ proficiency in serological analysis, are called into question.
There is support for Luke’s argument that, in affirming the DuBay military judge, the CCA overlooked the evidence from the USA-CIL investigation that Mills was engaged in misconduct during the time period Luke’s evidence was examined by USACIL. The primary focus of USACIL’s report on Mills’ misconduct was his DNA analyses performed between 2000 and 2005 “because of the increased potential for finding case samples still available for retesting” and “[t]his was also the period in which Mr. Mills performed a majority of his DNA casework.”[9] The report did, however, review Mills’ serology work from 1995 through 1999 and revealed *316 “thoroughness issues” with his serological analyses during the time period when Luke’s sample was analyzed.
Mills conducted serological analyses for thirty-seven Navy cases between 1995 and 1999. Of those thirty-seven cases, investigators found fifteen eases in which a review of Mills’ analysis revealed “thoroughness issues.” The report explained:
This review identified a lack of thoroughness in the work performed by Mr. Mills. Mr. Mills did not examine all the biological swabs and smears submitted for examination. This also resulted in him spending less time on examinations. He was not properly screening cases because of his lack of thoroughness and the shorter times spent on examinations_ [H]is screening techniques my [sic] have resulted in some questionable negative results in these eases.
Despite these thoroughness issues and the report’s conclusion that Mills’ screening techniques may have resulted in some questionable negative results during this time, the report did not contain any evidence of contamination or false reporting in Mills’ se-rological analysis between 1995 and 1999. Notably, the report indicated that Mills’ thoroughness issues may have resulted in negative findings where there may have in fact been forensic evidence present. “[Mills] had forty-nine negative cases in the period from 1995-2005. His examination of evidence was incomplete, rushed and not properly screened. Consequently it is doubtful that all forty-nine of these cases were completely negative.”
Based on USACIL’s final report, the DuBay military judge’s determination that Mills was proficient in serological analysis is clearly erroneous. Mills’ “thoroughness issues” reflect that he did mishandle evidence when he conducted serological analyses during the period when Luke’s evidence was processed by the lab. However, the other findings of the DuBay military judge as to Mills’ handling of Luke’s sample and the lack of evidence of contamination are not clearly erroneous and are therefore upheld by this court.[10]
Luke argues that the testimony of Chase and Mills was at the core of his conviction because it “assigned instant credibility to [TN]’s story” which was a critical issue in an “otherwise shaky” case. However, while the DNA evidence may have corroborated TN’s story, it was not what Military Rule of Evidence (M.R.E.) 608 defines as credibility evidence. See M.R.E. 608(a) (“The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation _”). Luke also alleges that the CCA incorrectly deemed the newly discovered evidence “merely” impeachment evidence. However, using evidence of Mills’ lack of thoroughness in his serological examinations and his mishandling of evidence during his DNA examinations to attack his credibility would indeed amount to impeachment evidence. See United States v. Banker, 15 M.J. 207, 210 (C.M.A.1983) (“Impeachment can be defined as an attack on the credibility or believability of a witness. In general, it is a pi’ocess of explaining away a witness’ testimony as to the existence of a fact at issue in a trial.”) (citations omitted). Regardless of how the CCA may have classified the DNA evidence, Luke is correct that Mills’ and Chase’s testimony supported the Government’s theory of the ease. However, Luke’s argument that TN’s “credibility was intertwined with the credibility of the DNA evidence” goes too far. This is not a case where the evidence of newly discovered evidence would have “substantially impeached the prosecutrix’ testimony on a material matter.” United States v. Williams, 37 M.J. 352, 354 (C.M.A.1993).
Luke also argues that there probably would be a different result at a new trial because the members would have no confidence that Mills had not contaminated the evidence, or, more broadly, that his misconduct would render him such a completely discredited witness that the members would *317 not believe him on any issue. While there is no evidence of any alleged contamination during the serological examination, such contamination could have only occurred in one of two ways: the sheet and bra may have been cross-contaminated; or Mills took blood from Luke’s sealed blood sample and contaminate ed the evidence during his serological examination. However, the military judge at the first DuBay hearing found that neither the bedsheet nor the bra could have been contaminated by other items because “the sample of the bra was cut and sealed in a test tube before the other items were opened.” Luke, 64 M.J. at 197. Luke has not established that this finding is clearly erroneous.
As to the possibility that Mills intentionally contaminated the evidence with Luke’s DNA from Luke’s blood sample, there is no evidence from either the DuBay hearing or the USACIL report that Mills intentionally contaminated a sample in order to support a prosecution.[11] There is no need to open or examine an individual’s blood sample during a serological examination of body fluids so the chance of contamination caused by a lack of thoroughness is diminished. Nor is there any evidence that Luke’s blood sample was ever examined or opened by Mills during the serological examination. While it is clear that Mills had “thoroughness” issues, those issues appear to have resulted from sloppiness and undue haste, not intentional contamination.
Luke also analogizes this court’s decision in United States v. Webb, 66 M.J. 89 (C.A.A.F.2008), to Luke’s case because “ ‘evidence that the observer, a link in the chain of custody, had been punished for dishonesty’ may have raised questions about the integrity of the appellant’s urinalysis.” Luke argues that the analysis for Webb and Luke’s eases must be the same. Webb, however, is distinguishable from the instant case. In Webb, we held merely that a military judge did not abuse her discretion in granting a defense motion for a new trial. Id. at 93. We did not hold that a new trial was actually required. Luke also relies on our case law for the proposition that “[a] petition for a new trial may rest upon newly discovered evidence that would ‘substantially impeach[ ]’ critical prosecution evidence ‘on a material matter.’ ” United States v. Sztuka, 43 M.J. 261, 268 (C.A.A.F.1995) (quoting Williams, 37 M.J. at 354) (alteration in original). While evidence of Mills’ misconduct would certainly have provided impeachment evidence as to Mills’ competence, it was attenuated in time and relevance. Luke does not dispute Chase’s analysis of the DNA on the sheet and TN’s bra but rather argues that evidence of Mills’ misconduct in other cases may have created a doubt in the members’ minds as to Mills’ overall competency or convinced them that he intentionally or negligently contaminated the evidence with Luke’s DNA during the serological analysis. As noted, the sero-logical evidence was not the only evidence the Government presented in Luke’s ease. Seaman Recruit TN and Fireman RA both testified for the Government contrary to Luke’s testimony. Our task is to determine “whether the ‘newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.’ ” Brooks, 49 M.J. at 69 (citation omitted).
The newly discovered evidence as it relates to this ease goes to the performance of the serology screening and not the DNA tests. Unless Luke can show on appeal a probability of contamination in the serology screening that would account for his DNA being present on the bra and blanket, he is left with the prospect of rebutting compelling DNA statistics [12] based on a defense that his prior mas *318 turbation and thumb-sucking resulted in the presence of his DNA in TN’s bra. Viewing the entire record of trial, to include the newly discovered evidence, the DuBay military judge’s findings that are supported by the evidence, and the relative weakness of Luke’s case,[13] we hold that the newly discovered evidence would probably not have resulted in a substantially more favorable result for Luke.[14]
II. Whether the military judge erred when he found the Government was not required to disclose PE 17 relating to statistical probabilities discussed on redirect examination

Factual and Procedural Background:

Following the testimony of the USA-CIL witnesses at court-martial, the Government called Dr. Christopher Basten, a research associate statistician from North Cai’olina State University, to testify as to the probability that Luke’s DNA was contained in the DNA mix found on the bra and the bedsheet versus that of someone else. After being qualified as an expert in statistical genetics, Dr. Basten testified as to the likelihood of Luke being a contributor to the stain on the sheet and bra under several different scenarios. During his testimony Dr. Basten was assisted by a series of demonstrative exhibits that set forth the numerical statistical likelihood that Luke was a contributor under the different assumptions presented to Dr. Basten.[15]
During the cross-examination of Dr. Bas-ten, defense counsel sought to discredit his explanation of the statistical findings and raised the possibility that other unknown contributors’ DNA could also be contained in the stain on the bra:
Q: But if you weren’t taking into account the profiles of the two people — let’s say that they were unknown — would that affect the way you do the calculations?
A: That would affect it if we didn’t have any information about the other individuals.
Q: Now, whenever there’s doubt as to the number of contributors to a mixed sample, there can be considerable variation in the likelihood ratio; is that correct?
A: There will be some variance, yes.
On redirect examination, trial counsel asked Dr. Basten to address the possibility raised by the defense of at least two unknown people contributing to the stains and referred him to PE 17, which had not been used in his direct examination:
Q: And Doctor, finally, in Prosecution Number 17, this is the possibility that the defense just addressed, two unknowns in the bra. Can you please explain your find- *319 mgs with respect to two other unknowns in the bra.
A: So another alternate explanation would be that it was [TN] and two unknown individuals. And if we compare that to the idea that it was Luke, [TN] and [RA], it’s — the evidence is 51 million times more likely that it’s the three of them than [TN] and two unknowns.
Shortly thereafter the defense counsel requested an Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000), session. During the Article 39(a), UCMJ, session Luke’s attorney complained to the military judge that the basis for the statistical analysis in PE 17 had never been provided to the defense during discovery. Trial counsel responded that Dr. Bas-ten had calculated the figures used in PE 17 “recently.” He argued that it was evidence in rebuttal and they were not required to provide rebuttal evidence in response to pretrial discovery requests. The military judge found that it was clearly rebuttal evidence to which the defense was not entitled during discovery. Defense counsel then argued that the probative value of the exhibit was outweighed by its prejudicial effect. The military judge held the prejudicial impact was minimal, that there was some probative value, and declined to strike the exhibit or provide a limiting instruction.
Before this court Luke argues that the military judge erred when he found that the Government was not required to disclose PE 17 to the defense prior to trial. He asserts that the defense never opened the door for the admission of this evidence during cross-examination and the admission of this evidence was not harmless because defense counsel was not prepared to properly cross-examine the witness on this point.
In response, the Government argues that trial counsel did not violate discovery obligations because the statistical ratio at issue in PE 17 had been calculated “recently” and the evidence was only presented in response to defense counsel’s assertions about two unknown contributors to the DNA profiles on the victim’s bra.
Rule for Courts-Martial 701(a)(2) provides:
After service of charges, upon request of the defense, the Government shall permit the defense to inspect:
(A) Any books, papers, documents, photographs, tangible objects, buildings, or places, or copies of portions thereof, which are within the possession, custody, or control of military authorities, and which are material to the preparation of the defense or are intended for use by the trial counsel as evidence in the prosecution case-in-chief at trial, or were obtained from or belong to the accused; and
(B) Any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody, or control of military authorities, the existence of which is known or by the exercise of due diligence may become known to the trial counsel, and which are material to the preparation of the defense or are intended for use by the trial counsel as evidence in the prosecution case-in-chief at trial.
“The military rules pertaining to discovery focus on equal access to evidence to aid the preparation of the defense and enhance the orderly administration of military justice.” United States v. Roberts, 59 M.J. 323, 325 (C.A.A.F.2004). “To this end, the discovery practice is not focused solely upon evidence known to be admissible at trial.... The parties to a court-martial should evaluate pretrial discovery and disclosure issues in light of this liberal mandate.” Id. (citation omitted).
Defense counsel’s discovery request sought “[a]ny handwritten, computer-generated, typed, or recorded statements by any witness for the government” as well as “[a]ny writing or document, including notes, used by a witness to refresh his/her memory for the purpose of testifying at trial, either while testifying or before testifying.” However, it is impossible for this court to address whether there was a discovery violation as the record does not reflect when PE 17 was prepared. We cannot know the meaning of trial counsel’s comment that PE 17 had only been produced “recently.” The other demonstrative exhibits used by Dr. Basten *320 (PEs 14, 15, 16, and 18) were used during direct examination and were in the same format as PE 17, which was used in rebuttal. In addition, comments made by trial counsel during the Article 39(a), UCMJ, session indicated that the Government anticipated that defense counsel would ask the question that he did during cross-examination, and that the Government was prepared to rebut it with PE 17. If it was prepared pretrial, it should have been provided to the defense in response to their discovery request pursuant to R.C.M. 701(a)(2) regardless of when the Government intended to use it. United States v. Trimper, 28 M.J. 460, 468 (C.M.A1989). Indeed “[a]n accused’s right to discovery is not limited to evidence that would be known to be admissible at trial. It includes materials that would assist the defense in formulating a defense strategy.” Webb, 66 M.J. at 92. However, if PE 17 was produced mid-trial in response to the cross-examination of Dr. Basten, then the Government could not have provided it to the defense pretrial because it did not exist.
Although we cannot resolve whether a discovery violation occurred, “[a]n appellate court may resolve a discovery issue without determining whether there has been a discovery violation if the court concludes that the alleged error would not have been prejudicial.” United States v. Santos, 59 M.J. 317, 321 (C.A.A.F.2004).
On direct examination, trial counsel elicited from Dr. Basten a full explanation of the statistics presenting the likelihood that biological evidence in the case linked Luke to the bra. Direct examination of Dr. Basten revealed information about his analysis, including which databases and populations he relied upon to generate the statistics presented. There was no objection during the direct examination of Dr. Basten as to the underlying calculations on the other demonstrative exhibits and apparently the statistical basis for those exhibits was no surprise to the defense. There is no indication that Dr. Basten relied on a separate database or population for the calculations in PE 17. It was simply a piece of demonstrative evidence that did no more than reiterate the expert’s testimony on direct examination. The defense therefore had all of the information necessary to understand how the calculations in PE 17 and the other demonstrative exhibits were derived. Further, given the multiple statistical formulations presented on direct examination, we cannot find that one additional calculation of the odds that the physical evidence was attributable to Luke tipped the scales against Luke in this case. Therefore, we find that the admission of PE 17 was not prejudicial.
III. Whether Luke’s due process rights were violated by untimely post-trial proceedings
The Court of Criminal Appeals reviewed Luke’s daim that he was denied speedy post-trial processing of his case. Luke, 2009 CCA LEXIS 270, at *21, 2009 WL 2345124, at *6. That court found that any due process violation that may have occurred in Luke’s case was harmless beyond a reasonable doubt. Id. at *22, 2009 WL 2345124, at *7.
Before this court Luke renews his argument that the eleven-year delay between his conviction and the lower court decision was unreasonable and is attributable to the Government. Luke cites the numerous motions for enlargement of time made by both his defense attorney and the Government before the lower court and also faults the Government for the delayed investigation into Mills’ misconduct. Luke claims he was prejudiced by the post-trial delay because the Government destroyed the physical evidence, making any review of the biological evidence impossible, and because the United States has denied his application for citizenship because of his court-martial conviction.
The Government cites the lengthy, in-depth investigation into Mills’ misconduct that was required to properly evaluate all the cases Mills handled as reason for the post-trial delay. Given these extraordinary circumstances, the Government argues that the post-trial delay in Luke’s case was reasonable. Further, the Government asserts that Luke’s arguments that he suffered prejudice are weak and he has not presented any con- *321 erete evidence as to why his application for citizenship was denied.
This court’s methodology for reviewing issues of post-trial and appellate delay was set out in United States v. Moreno, 63 M.J. 129 (C.A.A.F.2006). We first determine whether the delay is facially unreasonable and, if so, we examine the four factors set forth by the Supreme Court in Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). United States v. Young, 64 M.J. 404, 408-09 (C.A.A.F.2007). The four factors are: (1) the length of the delay; (2) the reasons for the delay; (3) the appellant’s assertion of the right to timely review and appeal; and (4) prejudice. Id. If this analysis leads us to conclude that the appellant has been denied the due process right to speedy post-trial review and appeal, we grant relief unless we are convinced beyond a reasonable doubt that the constitutional error is harmless. Id. at 409 (citation omitted). “Issues of due process and whether constitutional error is harmless beyond a reasonable doubt are reviewed de novo.” Id. (citation omitted).
With a delay of over eleven years between the completion of his court-martial and the issuance of the Court of Criminal Appeals decision, there is no doubt that the length of delay is facially unreasonable. However, we need not engage in a separate analysis of each factor where we can assume error and proceed directly to the conclusion that any error was harmless beyond a reasonable doubt. Id. Reviewing the totality of circumstances in this case,[16] including the fact that we have found no merit in either of substantive issues appealed by Luke, we conclude that any denial of his right to speedy post-trial review and appeal was harmless beyond a reasonable doubt.[17] See id.; United States v. Bush, 68 M.J. 96, 104 (C.A.A.F.2009) (holding denial of right to speedy post-trial review harmless beyond a reasonable doubt).

DECISION

The decision of the United States Navy-Marine Coi’ps Court of Criminal Appeals is affirmed.

. Prior to trial the Government dismissed with prejudice three specifications of indecent assault and three specifications of indecent language involving other victims. Luke was found not guilty of one specification of sodomy and two specifications of indecent language involving Seaman Recruit TN.

. Review was initially granted on the following issues:
I. Whether the lower court erred when it upheld the trial judge’s exclusion, during cross-examination, of an alleged victim's abortion after it became relevant and material rebuttal to the victim’s testimony.
II. Whether the lower court erred when it upheld the Government’s failure to disclose evidence that it had prepared to use on redirect examination of a Government witness.
United States v. Luke, 61 M.J. 278 (C.A.A.F.2005) (order granting review).
The supplemental issue was:
Whether Appellant’s conviction can be affirmed by this Court in light of the fact that evidence of fraudulent testing of DNA has been newly discovered.
United States v. Luke (Luke I), 63 M.J. 60, 61 (C.A.A.F.2006); United States v. Luke, 62 M.J. 328 (C.A.A.F.2005) (interlocutory order granting motion to file a supplemental issue).

. The underlying facts were detailed in this court’s 2006 decision and need not be repeated here. Luke I, 63 M.J. at 61.

. Serology is "the branch of science dealing with the properties, uses, and preparation of serums. A serum in this sense is a body fluid containing substances useful in the diagnosis, prevention, and treatment of disease.” 5 J.E. Schmidt, Attorneys' Dictionary of Medicine and Word Finder S — 119 (2010). As used here, Mills explained that "serology” was the examination of body fluid stains to determine the biochemical makeup of the stain.

. Chase testified that the DNA analysis on the panties did not reveal DNA profiles of anyone other than TN.

.At the first DuBay hearing, when asked whether she could tell whether the evidence provided by Mills had been contaminated, Chase replied, "I couldn’t tell if it’d been contaminated when I received the evidence and inventoried it, it didn’t look like anything unusual- I couldn’t tell unless there was something actually physically wrong.”

. Following the discovery of Mills’ misconduct, the U.S. Army Criminal Investigation Command began a remediation project to review/retest 465 cases on which Mills had worked between 1995 and 2005. This investigation had not been con-eluded at the time of the first DuBay hearing. The investigation also included two independent DNA investigators who were to review Mills' work and USACIL’s procedures.

. Article 73 provides that the accused may petition the Judge Advocate General for a new trial on the grounds of newly discovered evidence within two years after the convening authority approves the sentence. Article 73, UCMJ, 10 U.S.C. § 873 (2006). In his separate opinion, Judge Stucky argues that this time limit prohibits this court from exercising jurisdiction as to Issue I. United States v. Luke, 69 M.J. at 324 (C.A.A.F.2011) (Stucky, J., concurring in part and dissenting in part). Because this issue reached us on direct review under Article 67, UCMJ, 10 U.S.C. § 867 (2006), we disagree. When the evidence of Mills' misconduct was revealed to the defense while Luke's appeal was pending before this court, Luke’s appellate defense counsel filed a motion for a supplemental issue specifically noting that the procedure for granting a new trial based on newly discovered evidence “is to petition the Judge Advocate General for a new trial 'within 2 years after approval by the convening authority.' ” Luke’s appellate counsel explained, "[b]ecause the convening authority approved Appellant’s sentence over two years ago. Appellant is seeking relief from this court.” Indeed, in Luke I, this court granted the supplemental issue to determine whether the results of Luke's court-martial were reliable in light of newly discovered evidence. 63 M.J. at 61. Therefore this case is not before the court under a petition filed pursuant to Article 73, UCMJ, and as both parties agree that the framework of R.C.M. 1210 should govern our analysis, we proceed under the grant of the supplemental issue in Luke I.

. The report found that the first instance of Mills’ DNA false documentation was in 2002, four years after Luke's 1998 court-martial. The report found no cases with "DNA issues" for the time between 1995 and 1999.

. The second DuBay military judge’s findings are also clearly erroneous to the extent that he found that no prior fact established by the prior DuBay hearing were modified or altered as a result of the USACIL report.

. Luke cites two state cases to support his argument that Mills’ misconduct would completely undermine the validity and reliability of all of his forensic work. In re Investigation of the West Virginia State Police Crime Lab., 190 W.Va. 321, 438 S.E.2d501 (1993); State v. Gookins, 135 N.J. 42, 637 A.2d 1255 (1994). In both of those cases, however, the analyst/arresting officer repeatedly falsified data resulting in more convictions. In re W. Va. State Police Crime Lab., 438 S.E.2d at 503; Gookins, 637 A.2d at 1257. No evidence of falsification of evidence based on a motive to increase convictions has been established in this case.

. Dr. Basten testified that it was 290,000 times more likely that the DNA found on the bra was *318 from TN, RA, and Luke than TN, RA, and an unknown contributor.

. Luke’s defense was that TN and RA fabricated the allegations against him to avoid the consequences of the command discovering their romantic relationship, which was in violation of ship policy. This theory, however, is undermined by the fact that TN and RA voluntarily informed the command of their relationship when they reported the incident to the command. Luke also testified that on the date of the alleged events he masturbated on the bed in the hospital quarters using a lubricant called Surgi-lube and then fell asleep sucking his thumb, thereby accounting for the semen found on the linens and the possibility that Surgilube might be found on a swab NCIS took from his mouth.

. In his dissent, the Chief Judge argues Mesarosh v. United States, 352 U.S. 1, 12, 77 S.Ct. 1 (1956), dictates that "[b]ecause 'the original finder of fact’ was a court-martial panel, only a new panel 'can determine what it would do on a different body of evidence.’ ” United States v. Luke, 69 M.J. at 327 (C.A.A.F.2011) (Effron, C.J. dissenting). We are satisfied that the procedures traditionally utilized by this court to review cases presenting newly discovered evidence are appropriate in this case. See, e.g., Williams, 37 M.J. at 356; United States v. Johnson, 61 M.J. 195, 198 (C.A.A.F.2005).

.Prosecution Exhibits 14, 15, 16, and 18 were handwritten posters similar to PE 17 in format and all displayed the statistical likelihood that Luke and TN were contributors to the stains on the sheet and the bra in various combinations with Fireman RA and other unknown contributors. The record evidence of the exhibits includes the notation "PEs 14-18 ... used as demonstrative aid only.” None of these demonstrative exhibits were offered into evidence.

. We acknowledge that the delay in this case was extreme and take particular note of the second DuBay military judge’s conclusion regarding the speed of the Government’s review:
There appeared to be no sense of urgency on the part of the USACIL laboratory administration or their chain of command to resolve the weighty issues associated with the substantial allegations pending against them. While I do not consider the investigation of Mr. Mills and the subsequent analysis the model of dispatch, it does appear to be thorough.
However, the majority of the delay was attributable to the procedural back and forth among this court, the Court of Criminal Appeals, and the DuBay proceedings.

. We also note that there is no evidence in the record to support Luke’s contention that his application for citizenship was denied.