# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

**Misc. Dkt. No. 2016-18**

_____

**Robert D. COOK**
Master Sergeant (E-7), U.S. Air Force, *Petitioner*

**v.**

**UNITED STATES**
*Respondent*

_____

Petition for a New Trial Pursuant to Article 73, UCMJ

Decided 28 February 2017

_____

*Military Judge*: Shelly W. Schools.

*Approved sentence*: Dishonorable discharge, confinement for 18 months, and reduction to E-1. Sentence adjudged 10 April 2015 by GCM at MacDill Air Force Base, Florida.

*For Petitioner*: Brian A. Pristera, Esquire (argued), and Major Lauren A. Shure, USAF.

*For Respondent*: Captain Tyler B. Musselman, USAF (argued), and Gerald R. Bruce, Esquire.

Before MAYBERRY, SPERANZA, and JOHNSON, Appellate Military Judges.

Judge SPERANZA delivered the opinion of the court, in which Senior Judge MAYBERRY and Judge JOHNSON joined.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

_____

SPERANZA, Judge:

A general court-martial composed of officer and enlisted members found Petitioner guilty of sexual assault in violation of Article 120, Uniform Code of

Military Justice (UCMJ), 10 U.S.C. § 920. The court-martial sentenced Petitioner to a dishonorable discharge, confinement for 18 months, reduction to E-1, and forfeiture of all pay and allowances. The military judge denied Petitioner's request for a new trial following a post-trial Article 39(a), UCMJ, 10 U.S.C. § 839(a), session, during which Petitioner argued the discovery of new evidence demanded a new trial. The convening authority approved the findings and the sentence with the exception of disapproving the adjudged forfeitures and granting Petitioner's request for deferment and waiver of automatic forfeitures.

Petitioner filed a petition for a new trial with The Judge Advocate General (TJAG) of the United States Air Force pursuant to Article 73, UCMJ, 10 U.S.C. § 873. Accordingly, TJAG referred the petition for a new trial to this court, where Petitioner's appeal is pending.[1] Petitioner seeks a new trial based on the discovery of new evidence and fraud on the court. After reviewing the record before us, we grant the petition for a new trial.

## I. BACKGROUND

Technical Sergeant (TSgt) LT, TSgt MH, and Mrs. AA went to a local bar for a "ladies' night" out. Petitioner was also at this bar with his girlfriend, TSgt SB, who was an acquaintance of TSgt MH and Mrs. AA. Throughout the night, the women danced and drank alcohol. Observations about TSgt LT's level of intoxication during the night varied.

Near the end of the evening, Mrs. AA contacted her husband to pick her and TSgt LT up from the bar and take them home. While waiting for her husband to arrive, Mrs. AA walked with TSgt LT to Petitioner's car. TSgt LT got into the car but Mrs. AA then went back inside the bar. Petitioner drove his car to an adjacent lot where TSgt LT alleged Petitioner sexually assaulted her in the presence of TSgt SB, who was also in the car. During the sexual act, TSgt LT told Petitioner, "Oh my God, this is happening," and "Please don't, I'm not on birth control, my anniversary is coming up."

---

[1] Petitioner filed his petition and assignments of error on the same day. On appeal and in the alternative, Petitioner argues trial defense counsel was ineffective in failing to locate, interview, and call the only witness who could impeach the complaining witness on a critical issue for the merits and sentencing phases of trial, and this ineffective assistance prejudiced Petitioner by resulting in his conviction at trial. Accordingly, we ordered Petitioner's trial defense counsel, Major KM and Captain SL, to submit affidavits or declarations responsive to Petitioner's allegations.

After TSgt LT's friends returned to the parking lot and did not see Petitioner's car, they attempted to contact TSgt LT. After a short period of time, Petitioner drove back to the bar and was met by an angry Mrs. AA. TSgt LT exited the car on her own and told Mrs. AA that she was okay.

Mrs. AA's husband drove TSgt LT and Mrs. AA to TSgt LT's home. During the car ride, according to Mrs. AA, TSgt LT at first appeared fine. She was talking about what a fun night it was during the first 15 minutes or so, but then she began crying and apologizing to Mrs. AA's husband. When Mrs. AA asked TSgt LT what was wrong and why she was crying, TSgt LT said, "I think they raped me." Mrs. AA asked TSgt LT what she was talking about and if she was sure. Once they arrived at TSgt LT's home, Mrs. AA asked TSgt LT if she was lying. TSgt LT said "no." Mrs. AA contacted the police.

Local law enforcement arrived at TSgt LT's home in the early morning hours. TSgt LT provided a written statement and declined emergency medical care. A few hours after reporting the sexual assault, TSgt LT, accompanied by her husband, underwent a sexual assault nurse examination (SANE) that revealed redness in the area of her labia. TSgt LT said that she experienced pain and apparent swelling near her elbow, which she injured at the bar. The SANE report also noted C-section scarring; however, the SANE yielded no other pertinent forensic evidence.[2]

Civilian detectives interviewed TSgt LT the next day. During that interview, TSgt LT told detectives that she and her husband have their "issues" but maintained "I would never, I would never cheat on him." TSgt LT also stated, "[T]hey're saying I consented. If I consented, then I got nothing to, I've got nothing . . . I've got nothing to stand on."

During their case preparation and investigation, trial defense counsel became aware of rumors that TSgt LT had an extramarital affair with Mr. PS, a former Air Force member, while they were performing temporary duty (TDY). However, trial defense counsel was not able to positively identify or locate Mr. PS, nor could they corroborate rumors of an affair after conducting numerous witness interviews and searching military databases for Mr. PS using multiple permutations of his name.[3]

---

[2] An acid phosphatase test resulted in a presumptive positive for seminal fluid; however, further examination under a Woods lamp did not confirm the presence of seminal fluid. The SANE nurse also collected TSgt LT's underwear and shorts, as well as oral/buccal, perineum, vaginal, and cervical swabs.

[3] Trial defense counsel interviewed several witnesses regarding these rumors, including TSgt LT, her husband, TSgt MH, and Staff Sergeant (SSgt) BH. TSgt LT denied

*(Footnote continues on next page)*

Because TSgt SB—Petitioner's girlfriend—was under investigation and also facing court-martial charges arising out of the same incident, the convening authority declined to grant TSgt SB testimonial immunity in Petitioner's case. During the findings portion of Petitioner's trial, TSgt LT testified that she would not have consented to the alleged sexual act due to her sexual past, her monogamous relationship with her husband, and the pain she experiences during vaginal intercourse due to a medical condition. At sentencing, TSgt LT testified about the impact Petitioner's offense had on her relationship with her husband.

Three days after Petitioner's trial, TSgt MH informed trial defense counsel that she made contact with Mr. PS. Twelve days after Petitioner's trial, trial counsel sent Petitioner's trial defense counsel an email stating the following:

> This morning we received the Defense witness list in US v [TSgt SB]. That list included a person the Government had never spoke with or heard of before. After speaking with him, he stated that back in 2006, while on TDY, he engaged in sexual intercourse with [TSgt LT]. I am providing you this information pursuant to Brady v. Maryland, and my continuing discovery obligation. If you have any questions, let me know. Here is his information- Mr. [PS], [. . .].

Soon thereafter, TSgt LT signed a letter entitled "Victim Decision to Decline to Voluntarily Participate in the [general court-martial] against TSgt SB." The charges against TSgt SB were dismissed.

Defense counsel obtained an affidavit from Mr. PS in which he admitted he had consensual sexual intercourse with TSgt LT on one occasion in 2006 while they were TDY.

Approximately one and a half months after Petitioner's trial, the Defense moved for a post-trial Article 39(a) session and, *inter alia*, a new trial. The Government opposed the motion. The military judge granted the Defense's request for the post-trial session and held the session just over three months after Petitioner's trial. At the session, TSgt SB testified and described a con-

---

having a sexual relationship with Mr. PS or sexual encounters with anyone else during past TDYs. TSgt LT's husband denied knowledge of TSgt LT having an extramarital affair. TSgt MH stated that she did not have contact information for Mr. PS and surmised that Mr. PS would not be willing to admit to the alleged affair due to his personal circumstances. SSgt BH indicated he knew Mr. PS, but did not have any contact information since Mr. PS separated from the military.

sensual sexual encounter between Petitioner and TSgt LT. Mr. KM, a former military member and supervisor of TSgt LT, also testified. Mr. KM recounted a time when TSgt LT, after returning from TDY, told him that she was nervous during the TDY when her husband called because she was lying in bed with Mr. PS and had to tell Mr. PS to be quiet. Mr. KM also described TSgt LT explaining that she was staying late after work so she could meet Mr. PS at the family camp on base.

Mr. PS testified at the post-trial Article 39(a) as well. Mr. PS, contrary to his affidavit, claimed he had a sexual relationship with TSgt LT that included several instances of vaginal intercourse and oral sex. Mr. PS was also able to describe certain scars or marks on TSgt LT's stomach.

The defense paralegal testified about the Defense's efforts to locate Mr. PS before trial. The military judge also received an affidavit from one of Petitioner's trial defense counsel that further described efforts taken to locate Mr. PS.[4]

## II. DISCUSSION—PETITION FOR A NEW TRIAL (ARTICLE 73, UCMJ)

In order to prove its case, the Government had to prove the following elements beyond a reasonable doubt: one, that Petitioner committed a sexual act upon TSgt LT, to wit: causing penetration of her vulva with his penis; and two, that Petitioner did so when TSgt LT was incapable of consenting to the sexual act due to impairment by an intoxicant, to wit: alcohol, a condition that was known or reasonably should have been known by Petitioner.

Nevertheless, the Government, in its findings case-in-chief, chose to present evidence regarding whether TSgt LT *would* consent to the sexual act in addition to whether she was *capable* of consenting to the sexual act, as charged. Accordingly, the Government sponsored the following testimony from TSgt LT on direct examination:

> Q. [TSgt LT], I want to take a step back. *I want to talk about some of the reasons why you would not have consented to sexual intercourse that night*. I want to start with your marriage. How long have you been married?

---

[4] The Government also called its case paralegal who testified about the Government's preparation for the post-trial 39(a) session, including its interviews and database searches. The paralegal explained the relative ease with which the Government was able to find Mr. PS's personal contact information when this information was already known to the Government *after* Petitioner's trial.

A. Going on 13 years.

Q. Thirteen years. And how did you meet your husband?

A. I was in high school. I was 15 with three friends at the fair.

Q. And I'm going to commit the cardinal sin of asking how old are you now?

A. 30.

Q. So you've known him for 15 and been married for 13 years?

A. Correct.

Q. Is that correct?

A. That's correct.

Q. *[TSgt LT], have you had any other sexual partners?*

A. *I have not.*

Q. *Your husband is the only sexual partner you've ever had?*

A. *That's correct.*

Q. In June of 2014, how would you describe your marriage?

A. It was good. I mean we were—our goal was to get here to Tampa. We were at Patrick for 7 years and loved Florida. We wanted to come back to Florida and we got here and we had just bought a brand-new home. We bought our first house. Actually things were really good. I mean, we've been married for 13 years, I'm not going to say we—he's a man. He drives me crazy, but it was as good as—it was good. Everything was—

Q. Now we heard yesterday, [TSgt LT], that you fabricated this allegation in order to save your marriage. Is that true?

A. That's not true.

Q. Tell the members how you know that that is untrue.

A. I love my husband with all my heart. He's my soul mate without him I wouldn't be where I am today. Anything I've ever needed he has been there for. I've had sexual issues myself and he's been there. Like I have medical issues and he has been there through all of it. He's been by my side. I couldn't ask for more supportive, more of a great father to my children. I have absolutely no reason no desire for anybody but my husband. He's been the one that I wanted my entire life and he's the one I have.

. . . .

Q. [TSgt LT], had you come home that night like you said you were wasted, had you come home wasted like you were, did you fear in June 2014 that as a result of being wasted, your husband would leave you?

A. Being drunk?

Q. Right.

A. No.

. . . .

Q. Now I want to talk about one of the other reasons you would not have consented that evening. *You said that your husband was your only sexual partner?*

A. *That's correct.*

The Government also directed TSgt LT's testimony to a medical condition she suffered by signaling, "I'm going to talk to you about the medical issue that you have . . . ." TSgt LT then testified that ever since the birth of her son, who was eight at the time of trial, she had a medical condition that made sexual intercourse painful for her. Although she testified her husband was "always" supportive, she said they had an ongoing concern about the ability to have intercourse as "[i]t takes a lot for me to enjoy it and be able to have intercourse with my husband."

After trial defense counsel attacked TSgt LT's credibility on cross-examination, the Government presented three witnesses, an officer and two noncommissioned officers, who offered positive opinions of TSgt LT's character for truthfulness.

After identifying the elements of the offense, the military judge instructed the members in findings, as follows:

"Consent" means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance or submission resulting from the use of force, threat of force, or placing another person in fear does not constitute consent. A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused and the conduct at issue shall not constitute consent.

*The evidence has raised the issue of whether [TSgt LT] consented to the sexual conduct elicited in the Specification of the*

*Charge. All of the evidence concerning consent to sexual conduct is relevant and must be considered in determining whether the government has proven the elements of the offense beyond a reasonable doubt. Stated another way, evidence the alleged victim consented to the sexual conduct, either alone or in conjunction with the other evidence in the case, may cause you to have a reasonable doubt as to whether the government has proven every element of the offense.*

The evidence has also raised the issue of mistake on the part of the accused concerning [TSgt LT's] condition in relation to the charged offense.

I advised you earlier that to find the accused guilty of the offense, you must find beyond a reasonable doubt that the accused knew or reasonably should have known that [TSgt LT] was incapable of consenting to the sexual conduct due to impairment by an intoxicant. The accused is not guilty of the offense of sexual assault if:

One, the accused did not know that [TSgt LT] was incapable of consenting to the sexual conduct due to impairment by an intoxicant; and

Two, such belief on his part was reasonable.

To be reasonable, the belief must have been based on information, or lack of it, which would indicate to a reasonable person that [TSgt LT] was capable of consenting to the sexual conduct.

Additionally, the mistake cannot be based on a negligent failure to discover the true facts. Negligence is the absence of due care. "Due care" is what a reasonably careful person would do under the same or similar circumstances. You should consider the accused's age, education, and experience, along with the other evidence on this issue.

The burden is on the prosecution to establish the accused's guilt. If you are convinced beyond a reasonable doubt that, at the time of the charged offense, the accused did not mistakenly believe that [TSgt LT] was capable of consenting to the sexual conduct, the defense of mistake does not exist. Even if you conclude that the accused did mistakenly believe that [TSgt LT] was capable of consenting to the sexual conduct, but you are convinced beyond a reasonable doubt that, at the time of the

charged offense, the accused's mistake was unreasonable, the defense of mistake does not exist.

> In weighing any discrepancy by a witness or between witnesses, you should consider whether it resulted from an innocent mistake or a deliberate lie. Taking all these matters into account, you should then consider the probability of each witness' testimony and the inclination of the witness to tell the truth. The believability of each witness' testimony should be your guide in evaluating testimony and not the number of witnesses called. (Emphasis added).

Regarding the determination of TSgt LT's credibility, the military judge instructed:

> Evidence has been received as to personal opinions regarding [TSgt LT]'s character for truthfulness. Any such testimony, however, does not constitute an opinion by any witness as to whether a crime did or did not occur. This information constitutes those witnesses personal opinion of [TSgt LT]'s character for truthfulness generally. You may consider this evidence and give it whatever weight you believe it deserves, in determining [TSgt LT]'s believability.

> Only you, the member of the court, determine the credibility of the witnesses and what the facts are in this case. No witness, expert or otherwise, can testify that the alleged victim's account of what occurred is true or credible or that a witness believes the alleged victim. To the extent that you believe that any witness stated that they believed the alleged victim or that a crime occurred, you may not consider this as evidence that a crime occurred or evidence of the alleged victim's credibility.

Throughout the Government's findings argument, trial counsel emphatically endorsed TSgt LT's credibility by, in part, challenging the members to quickly return a finding of not guilty if they did not believe TSgt LT and repeatedly asking questions such as, "Is she making this up?" and "Is she lying the entire time?" Trial defense counsel maintained that TSgt LT consented to sex with Petitioner but lied about it to prevent losing her husband or causing further issues in her marriage. Even though the military judge did not instruct the members with respect to mistake of fact *as to consent*, the Defense also advanced such a theory due to TSgt LT's interactions and statements to Petitioner about her not being on birth control. In closing, trial counsel argued the evidence did not support the conclusion that TSgt LT fabricated the allegation in order to save her marriage.

In sentencing, TSgt LT testified about her sexually monogamous relationship with her husband and how the alleged sexual assault was an affront to her marriage:

> For the past 15 years, I've been proud to say I've only ever been with one man and that man's my husband. [Petitioner] has taken that from me. I can still say that I've chosen to be with only [one] man, my husband, but I feel I have lost a piece of myself.

Petitioner argues that he is entitled to a new trial on two grounds: (1) due to the discovery of new evidence showing TSgt LT engaged in an extramarital affair; and (2) because TSgt LT committed a fraud upon the court by testifying to the contrary.[5]

We review a petition for a new trial de novo, but "the evidence considered at [a] post-trial session is, of course, relevant to our analysis." *See United States v. Harris*, 61 M.J. 391, 393 n.3 (C.A.A.F. 2005).

"The determination of sufficient grounds for granting a petition for new trial in the military rests 'within the [sound] discretion of the authority considering . . . [that] petition.'" *United States v. Bacon* 12 M.J. 489, 492 (C.M.A. 1982). Accordingly, it is this court's prerogative to weigh the testimony at trial against the post-trial evidence to determine which is credible. *Id*. We are also free to exercise our factfinding powers. *See id*. The only limit on our factfinding powers is that our "broad discretion must not be abused." *Id*.; *see also United States v. Evans*, 26 M.J. 550, 552 (A.C.M.R. 1988), *aff'd*, 27 M.J. 447 (C.M.A. 1988), *cert. denied*, 490 U.S. 1092 (1989) ("Our ability to weigh trial testimony or exercise factfinding powers is limited solely in that our broad discretion may not be abused.").

A Petitioner may petition for a new trial "on the grounds of newly discovered evidence or fraud on the court." Article 73, UCMJ, 10 U.S.C. § 873. Petitions for a new trial do not proceed through the usual appellate chain. *Id*.; *see United States v. Brooks*, 49 M.J. 64, 68 (C.A.A.F. 1998). Instead, they are submitted to TJAG, who acts on the petition unless the case is pending before an appellate court, in which case he refers the petition to the appellate court where the case is pending. Rules for Courts-Martial (R.C.M.) 1210(a), (e).

A new trial shall not be granted on the grounds of newly discovered evidence unless the petition shows that:

---

[5] A determination of whether TSgt LT committed a fraud upon the court is not necessary given our findings with respect to the newly discovered evidence.

(A) The evidence was discovered after the trial;

(B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and

(C) The newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.

R.C.M. 1210(f)(2); *see United States v. Luke*, 69 M.J. 309 (C.A.A.F. 2011); *United States v. Johnson*, 61 M.J. 195, 198–99 (C.A.A.F. 2005).

"[R]equests for a new trial . . . are generally disfavored," and are "granted only if a manifest injustice would result absent a new trial . . . based on proffered newly discovered evidence." *United States v. Hull*, 70 M.J. 145, 152 (C.A.A.F. 2011) (quoting *United States v Williams*, 37 M.J. 352, 356 (C.M.A. 1993)).

Trial defense counsel discovered the *evidence* of an extramarital affair between TSgt LT and Mr. PS after Petitioner's trial and with the assistance of the Government, whose representatives only came upon Mr. PS's contact information after Petitioner's conviction and during the pre-trial preparation for TSgt SB's prosecution. Prior to TSgt MH's and the Government's post-trial disclosures, trial defense counsel only had mere *rumors* that TSgt LT engaged in an extramarital affair nine years earlier.

The fact that trial defense counsel was only aware of these rumors and did not uncover any corroborating evidence was not due to a lack of due diligence. TSgt LT denied having affairs or any such a relationship in the pretrial interview with trial defense counsel. Her husband confirmed as much in his interview. Other witnesses who had contact information regarding Mr. PS decided, for whatever reason, not to disclose its existence to trial defense counsel prior to Petitioner's trial. Moreover, the trial defense team was reasonably diligent in its efforts to locate a former military member who may have had an extramarital affair with the alleged victim of a sexual assault nine years previously. Given the nature of the charged offense—sexual assault when Petitioner knew or reasonably should have known TSgt LT was incapable of consenting due to impairment by alcohol intoxication—and the results of their interviews, trial defense counsel understandably focused on discerning how impaired TSgt LT was at the time of the alleged sexual act. Therefore, on the record before us, we find that trial defense counsel exercised the requisite due diligence in their attempts to corroborate a rumor of an old affair.

We now turn to the third requirement for granting a new trial based on newly discovered evidence. In Petitioner's trial, the Government sought to prove that TSgt LT would not have consented to the alleged sexual act because she never engaged in sexual relationships with anyone other than her husband and her medical conditions cause even consensual vaginal intercourse with her husband to be painful. Accordingly, in findings, TSgt LT's consent to the alleged sexual act, or lack thereof, became a material matter for the members to consider when determining whether the Government had proven the elements of the charged offense beyond a reasonable doubt. The resolution of the issue of consent, like most of the material facts in Petitioner's trial, rested squarely upon the credibility of TSgt LT. *See Williams*, 37 M.J. at 358. "Thus, in the absence of physical evidence and direct corroboration testimony, factors affecting [TSgt LT's credibility] were clearly of critical importance." *Id.*

The record before us establishes that the newly found evidence regarding TSgt LT's extramarital sexual relationship with Mr. PS would probably produce a substantially more favorable result for Petitioner in findings and, at the very least, sentencing. Moreover, evidence that TSgt LT engaged in an extramarital affair with Mr. PS discloses noncumulative impeachment evidence that is relevant not only to a *material* issue in the case, but the *dispositive* issue in Petitioner's case—TSgt LT's credibility. *Id.* at 375. We also note that this newly discovered evidence may not only show that TSgt LT did, in fact, have an extramarital affair in direct contradiction to her previous statements and testimony,[6] but that she may have been dishonest with detectives and trial defense counsel during her interviews, and concealed the affair from her husband, Government counsel, Government character witnesses, and a court-martial panel. *See id.* at 359. Considering the entire record before us, we conclude that this devastating evidence concerning TSgt LT's credibility and the veracity of her testimony, if considered by Petitioner's court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for Petitioner.

---

[6] We have considered matters related to Mr. PS's credibility, but find the proffered evidence sufficiently believable to make a more favorable result probable for Petitioner. *United States v. Luke*, 69 M.J. 309, 314 (C.A.A.F. 2011) ("The reviewing court does not determine whether the proffered evidence is true; nor does it determine historical facts. It merely decides if the evidence is sufficiently believable to make a more favorable result probable.").

### III. CONCLUSION

The findings and the sentence are **SET ASIDE**. Petitioner's petition for a new trial is **GRANTED**. The record is returned to TJAG for action consistent with this opinion.

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court